# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MARION RUCKER and APRIL MILLER and CARL MILLER, as husband and wife and the marital community thereof, | ) ) ) ) | DIVISION ONE<br><br>No. 67770-5-I |
| Appellant, | ) ) ) ) | ORDER GRANTING MOTIONS TO PUBLISH |
| v. | ) ) | |
| NOVASTAR MORTGAGE, INC., and QUALITY LOAN SERVICING OF WASHINGTON, | ) ) ) ) | |
| Respondent. | ) ) ) | |

The appellants having filed a motion to publish opinion, and Columbia

Legal Services, Northwest Justice Project, and Northwest Consumer Law Center,

non-parties in this action, having filed a motion to publish opinion, and the

hearing panel having reconsidered its prior determination and finding that the

opinion will be of precedential value; now, therefore, it is hereby:

ORDERED that the unpublished opinion filed August 5, 2013, shall be

published and printed in the Washington Appellate Reports.

Done this 2nd day of October, 2013.

For the Court:

_____
Judge


IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MARION RUCKER and APRIL MILLER and CARL MILLER, as husband and wife and the marital community thereof, | ) ) ) ) ) | DIVISION ONE<br><br>No. 67770-5-I |
| Appellant, | ) ) | PUBLISHED OPINION |
| v. | ) ) ) | |
| NOVASTAR MORTGAGE, INC., and QUALITY LOAN SERVICING OF WASHINGTON, | ) ) ) ) ) | |
| Respondent. | ) ) | FILED: August 5, 2013 |

DWYER, J. — Marion Rucker and April Miller appeal from a summary judgment order dismissing their claims under the Washington deeds of trust act, chapter 61.24 RCW (DTA). They contend that genuine issues of material fact exist regarding whether Rucker's property was actually sold at a trustee's sale and that, accordingly, summary judgment in favor of NovaStar Mortgage, Inc.— the winning bidder at the disputed trustee's sale—was improperly granted. They further contend that, even if the sale did occur, it was invalid because the trustee, Quality Loan Service Corporation of Washington (QLS), was not properly appointed by an eligible beneficiary prior to the sale taking place. Because there are genuine issues of material fact regarding QLS's authority to conduct a valid trustee's sale, we reverse the trial court's summary judgment order and remand for further proceedings.

I

In early 2006, April Miller and her husband, Carl Miller, were seeking to purchase a home. In February, Carl[1] signed a purchase and sale agreement to acquire a residence in Woodinville for $468,000. The couple asked April's father, Marion Rucker, to assist them with the purchase. Rucker agreed.

Rucker, who resided in California, was unable to travel to Washington to sign the loan documents. Accordingly, April asked her sister, Micaela, if she would sign the necessary documents on their father's behalf. Micaela agreed. April thereafter arranged for Rucker to sign a durable power of attorney granting to Micaela specific powers to buy, acquire, and do all acts necessary to complete the purchase and sale of the property.[2]

On March 23, 2006, Micaela met with an escrow agent to complete the transaction. An addendum to the purchase and sale agreement assigned the contract from Carl to Rucker. The purchase price of the property was satisfied by two loans issued by NovaStar Mortgage, Inc. The promissory note for the first position loan, in the amount of $374,400, listed Rucker as the borrower and NovaStar as the lender. The promissory note for the second position loan, in the amount of $93,600, also named Rucker as the borrower and NovaStar as the lender.

Each note was secured by a deed of trust. Both deeds of trust listed

---

[1] In order to avoid confusion, April Miller and Carl Miller are referred to by their first names throughout this opinion. April's sister, Micaela Rucker, is also referred to by her first name.

[2] Rucker signed the power of attorney on March 24, 2006, one day after the loan documents were signed by Micaela.

Rucker as the grantor and both NovaStar and Mortgage Electronic Registration Systems, Inc. (MERS) as "grantees." Quality Loan Services, located in San Diego, California, was named as the trustee. NovaStar was additionally listed as the lender, and MERS was additionally listed as the beneficiary, acting as the "nominee" of NovaStar and NovaStar's "successors and assigns." These documents were recorded on March 24, 2006.[3]

April and Carl thereafter moved into the house on the Woodinville property. Micaela also moved into the residence and resided there for several months. Rucker began to make monthly payments on the loans.

On June 15, 2006, both of Rucker's loans were conveyed by NovaStar to JPMorgan Chase Bank and J.P. Morgan Trust Company. The loans were securitized into the NovaStar Mortgage Funding Trust, Series 2006-2, NFI 2006-2, Group II (Funding Trust). JPMorgan Chase and J.P. Morgan Trust served as "co-trustees" of the Funding Trust.

Pursuant to a "pooling and servicing agreement," NovaStar retained responsibility for servicing Rucker's loans. The agreement stipulated that NovaStar's authority as servicer included the power to

> effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing a related Mortgage Loan, including the employment of attorneys, the institution of legal proceedings, the collection of deficiency judgments, the acceptance of compromise proposals and any other matter pertaining to a delinquent Mortgage Loan.

---

[3] Micaela also signed, on behalf of Rucker, occupancy and financial affidavits, borrower's certifications, and a Housing and Urban Development settlement statement. In addition, Rucker's wife, Annette Rucker, later executed a quitclaim deed, relinquishing her interest in the Woodinville property.

In addition, the agreement specified that NovaStar was authorized to "exercise this power in its own name." The relationship of NovaStar to JPMorgan Chase and J.P. Morgan Trust was "intended by the parties to be that of an independent contractor and not that of a joint venturer, partner or agent."

In September 2006, Rucker ceased to make payments on the loans, and a nonjudicial foreclosure action was initiated on his second position loan. On December 6, 2006, NovaStar, acting as "beneficiary," executed an "Appointment of Successor Trustee" appointing QLS as trustee.[4] This document was recorded on December 20, 2006.

On December 8, 2006, a notice of default was sent by QLS to the Woodinville residence. The notice was also posted on the property. The notice stated that $5,053.04 must be paid to NovaStar in order to cure the default. QLS stated that it was acting as "Agent for NOVASTAR MORTGAGE INC., the Beneficiary."

On March 16, 2007, MERS executed an "Assignment of Deed of Trust" purporting to transfer the beneficial interest in the deed of trust to NovaStar. This document was recorded on March 28, 2007.

On March 23, 2007, a notice of trustee's sale was issued by QLS. This document was mailed to the Woodinville residence, posted on the property, and published on May 29, 2007 and June 19, 2007. The notice stated that a trustee's sale would be held by QLS at the main entrance of the King County

---

[4] QLS, a corporation formed under Washington law, is a different entity than the original trustee, Quality Loan Services.

Administration building on June 29, 2007. The document stated that in order to cure the default, $8,526.44 must be paid to "NOVASTAR MORTGAGE, INC., the Beneficiary of your Deed of Trust and owner of the obligation secured thereby." The notice further explained that a lawsuit could be brought in order to restrain the sale and that "[f]ailure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale."[5]

April thereafter contacted both QLS and NovaStar regarding the upcoming trustee's sale. She would later testify that she spoke to Lysette Vargas at QLS. April stated that Vargas told her that due to uncertainty relating to the origination of the loans, the sale would be postponed.

Nevertheless, on June 29, 2007, the trustee's sale was held as scheduled. Jake Patterson conducted the sale. The property was sold to NovaStar for the "amount of the opening bid, $106,852.95."[6] QLS thereafter issued a trustee's deed to NovaStar, conveying its interest in the Woodinville property.

On May 20, 2008, NovaStar filed an unlawful detainer action seeking to evict April and Carl from the Woodinville property. A writ of restitution was granted to NovaStar on October 8, 2008.

Rucker and the Millers thereafter filed a lawsuit against NovaStar and QLS seeking to quiet title, invalidate the trustee's deed, and restrain execution of the

---

[5] The notice of trustee's sale was recorded on March 28, 2007.

[6] April and Carl also went to King County Administration building on the day of the scheduled sale. Each would later testify that although they heard many properties being called, they did not hear an announcement of the sale of the Woodinville property.

writ of restitution.[7] On November 18, 2008, the trial court granted a preliminary injunction prohibiting NovaStar from executing on the writ of restitution.

Numerous procedural delays followed. April and Rucker retained and then terminated the services of several different attorneys and law firms during the course of the litigation.[8] Rucker filed for Chapter 13 Bankruptcy on two occasions during the proceedings, leading to stays of the state court proceedings. The writ of restitution expired and was reissued several times.

Then, on July 16, 2010, the trustee's deed—granted by QLS to NovaStar at the trustee's sale three years before—was amended and rerecorded "upon sale to correct the vesting." The Bank of New York Mellon—as "Successor Trustee under the NovaStar Mortgage Funding Trust, Series 2006-2"—was substituted for NovaStar as the grantee of the trustee's deed.[9]

Both parties thereafter moved for summary judgment. On September 22, 2011, the trial court entered an order granting NovaStar's motion for summary judgment and denying the summary judgment motion of Rucker and April. The court ordered that NovaStar was entitled to immediate possession of the Woodinville property and to reissuance of a writ of restitution.

---

[7] On March 21, 2011, the trial court entered "a stipulation and order" permitting QLS to cease participation in the litigation. The order stipulated that Rucker and April would seek no damages against QLS, but that QLS would be bound by any order or judgment issued by the trial court with regard to the Woodinville property.

[8] The attorneys and law firms that have represented Rucker and the Millers include: (1) Clausen Law Firm; (2) Joseph Rockne; (3) W. Dan Nelson; (4) Diane B. Templin; (5) Betts Patterson Mines; (6) Marja Starczewski; and (7) Jason Anderson.

[9] The record does not reflect on what date the Bank of New York Mellon succeeded JPMorgan Chase and J.P. Morgan Trust as the trustee of the Funding Trust.

Rucker and April appeal.[10]

II

Rucker and April first contend that the trial court erred by granting summary judgment to NovaStar because, they contend, there are genuine issues of material fact regarding whether a trustee's sale actually occurred. We disagree.

In reviewing an order of summary judgment, we engage in the same inquiry as the trial court. Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). The facts and all reasonable inferences therefrom must be viewed in the light most favorable to the nonmoving party. Lybbert, 141 Wn.2d at 34. Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Lybbert, 141 Wn.2d at 34. Mere allegations or conclusory statements of facts unsupported by evidence are not sufficient to establish a genuine issue. Baldwin v. Sisters of Providence in Wash., Inc., 112 Wn.2d 127, 132, 769 P.2d 298 (1989). Nor may the nonmoving party rely on "speculation, argumentative assertions that unresolved factual issues remain, or in having its affidavits considered at face value." Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986). Although normally left for the trial process, questions of fact may be treated as matters of law when reasonable minds could reach only one

---

[10] In its motion for summary judgment, NovaStar stated that April had filed for dissolution of her marriage to Carl and that Carl no longer resided at the Woodinville property. Accordingly, NovaStar requested that Carl be dismissed from the lawsuit. Although the trial court's disposition of that issue is not disclosed by the parties, only Rucker and April are represented in this appeal.

conclusion. <u>Colo. Structures, Inc., v. Blue Mountain Plaza, LLC</u>, 159 Wn. App. 654, 661, 246 P.3d 835 (2011).

The DTA governs the procedures for nonjudicial foreclosure in Washington. <u>See</u> 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 20.1, at 403 (2d ed. 2004). A deed of trust differs from a standard mortgage because it involves not only a lender and a borrower, but also a third party called a trustee. <u>See</u> <u>Bain v. Metro. Mortg. Grp., Inc.</u>, 175 Wn.2d 83, 92-93, 285 P.3d 34 (2012). If a borrower defaults on the loan, the trustee may conduct a nonjudicial foreclosure sale. Such sales must occur in a "designated public place within the county where the property is located." RCW 61.24.040(5). Either the trustee or its authorized agent must "sell the property at public auction to the highest bidder." RCW 61.24.040(4). The purchaser at the trustee's sale is "entitled to possession of the property on the twentieth day following the sale." RCW 61.24.060(1).

Here, as Rucker and April correctly point out, NovaStar's entitlement to Rucker's property depends upon the existence of the trustee's sale. NovaStar was the winning bidder at the sale, acquiring title to Rucker's property through conveyance of a trustee's deed. If no trustee's sale in fact took place, then NovaStar never took title to the property, was not entitled to possession following the sale, and, accordingly, has no right to enforce the writ of restitution.

However, there is no genuine issue of material fact with regard the existence of the sale. The foreclosure sale was scheduled for 10:00 a.m. on June 29, 2007. The notice of trustee's sale stated that the sale would be

conducted at the main entrance of the King County Administration building.

Patterson, the authorized agent of QLS charged with conducting the sale,

testified that the sale went forward as scheduled:

> I conducted the Sale on June 29, 2007, at 10 a.m. at the main entrance to the Administration Building, 500 4th Avenue, Seattle, WA. . . . I did not call a postponement of the Sale; and the property was sold back to the beneficiary for the amount of the opening bid, $106,852.95.

Patterson submitted several examples of a "certificate of sale" in which a

property had been sold back to the beneficiary at a trustee's sale. The document

pertaining to the sale of the Woodinville property was identical to these

certificates of sale.[11]

In contrast to this affirmative evidence of the sale, the testimony of April

and Carl constitutes mere speculation. April stated in her declaration that an

employee of QLS told her that the sale would be postponed. Nevertheless, she

and her husband decided to attend the sale because she was "still concerned

that a sale might take place." April explained that upon arriving at the King

County Administration building at the appointed time, she spoke to several

persons about the sale. She stated: "No one we spoke with had any information

about the property or the sale. We stayed in the sale area for some time after

10:00 a.m. We heard many properties being called. No one called my father's

property." Similarly, Carl stated in his declaration that "[w]e heard many

properties being called. No one called my father in law's property."

---

[11] Patterson also submitted examples of documents generated when a foreclosure sale is either postponed or cancelled. The certificate of sale for the Woodinville property did not resemble these documents.

Neither Carl nor April, however, offered any evidence identifying with whom they spoke at the trustee's sale.[12] Patterson specifically testified that he did not "tell anyone that the sale had been cancelled or postponed." As Patterson explained, "[f]oreclosure sales are literally organized mayhem; there are numerous criers, crying any number of properties at once. Unless an individual knew which caller would be calling a particular property, it would be practically impossible to ascertain which properties were called or postponed." Accordingly, the fact that April and Carl did not hear Rucker's property being called does not indicate that no sale took place.

Similarly, April's testimony that an employee of QLS told her that the property would not be sold is not evidence that no sale occurred. It is true that ordinarily such a statement by a QLS employee could give rise to an inference that the sale had not taken place. Here, however, it is undisputed that the sale was conducted, not by QLS, but by North West Legal Support, Inc., the authorized agent of QLS charged with selling the property at foreclosure. Accordingly, the employee at QLS would not have had personal knowledge of the sale. Moreover, in this case, the person who actually conducted the sale testified that the sale took place as scheduled. Patterson, "acting as an independent contractor for North West Legal Support," stated in his affidavit that

---

[12] April's memory regarding the day of the sale was hazy. At the hearing on Rucker's motion for a preliminary injunction, April was unable to describe the location of the King County Administration building or to indicate where in the building the sale had taken place. By way of explanation, she told the court: "I'm sick, Your Honor, and I'm on medication so—I have a virus and I have cancer, so I'm a little sick today. I barely made it here."

the Woodinville property was sold to NovaStar at the trustee's sale. This testimony was supported by additional documentation evidencing the sale.

Given the evidence presented, reasonable minds could conclude only that Rucker's property was sold at the trustee's sale. See Colorado Structures, 159 Wn. App. at 661. The evidence presented by Rucker and April was not inconsistent with a sale taking place. The trial court did not err by granting summary judgment with regard to this issue.

### III

Rucker and April next contend that the trustee's sale is invalid because NovaStar had no authority to appoint QLS as successor trustee. This is so, they assert, because NovaStar was not the holder of Rucker's promissory note at the time that NovaStar executed the appointment. Accordingly, they reason, because QLS was not statutorily authorized to conduct a trustee's sale, the sale of the Woodinville property must be vacated. We agree that the trial court erred by dismissing this claim on summary judgment.

A nonjudicial foreclosure sale must be conducted by a "trustee or its authorized agent." Former RCW 61.24.040(4) (1998). The trustee may be named in the deed of trust or be replaced by the "beneficiary." Former RCW 61.24.010(2) (1998). The "beneficiary" is defined as "the holder of the instrument or document evidencing the obligations secured by the deed of trust." Former RCW 61.24.005(2) (1998). After the appointment is properly recorded, the successor trustee is "vested with all powers of an original trustee." Former RCW 61.24.010(2) (1998).

Because the DTA dispenses with many protections commonly enjoyed by borrowers, "lenders must strictly comply with the statutes, and courts must strictly construe the statutes in the borrower's favor." Amresco Independence Funding, Inc. v. SPS Props., L.L.C., 129 Wn. App. 532, 537, 119 P.3d 884 (2005). Applying these principles, our Supreme Court has explained that "only the actual holder of the promissory note or other instrument evidencing the obligation may be a beneficiary with the power to appoint a trustee to proceed with a nonjudicial foreclosure on real property." Bain, 175 Wn.2d at 89. "[W]hen an unlawful beneficiary appoints a successor trustee, the putative trustee lacks the legal authority to record and serve a notice of trustee's sale." Walker v. Quality Loan Serv. Corp., No. 65975-8-I, slip op. at 7 (Wash. App. Aug. __, 2013). Such actions by the improperly appointed trustee, we have explained, constitute "material violations of the DTA." Walker, No. 65975-8-I, slip op. at 10.

This, of course, is precisely the defect in the foreclosure proceedings that Rucker and April assert occurred in this case. At the time that NovaStar appointed QLS as successor trustee, it did not hold the promissory note, having already conveyed the note to JPMorgan Chase and J.P. Morgan Trust as co-trustees of the Funding Trust. Accordingly, Rucker and April assert, NovaStar was not a proper beneficiary under the DTA. Because NovaStar had no "power to appoint a trustee to proceed with a nonjudicial foreclosure," Bain, 175 Wn.2d at 89, the company could not lawfully appoint QLS to foreclose on Rucker's property. And, because QLS was not a proper successor trustee vested with the power to conduct a nonjudicial foreclosure sale, the subsequent sale of the

- 12 -

property was improper.

NovaStar concedes that it did not hold the promissory note at the time that it appointed QLS as successor trustee. Instead, NovaStar contends that the pooling and servicing agreement—setting forth the company's duties as the servicer of Rucker's loans—expressly authorized NovaStar to commence all acts necessary for foreclosure in its own name. In essence, the company argues that it was entitled to act as an agent for the true beneficiary.

As NovaStar correctly points out, in Bain, our Supreme Court explained that a note holder may utilize agents under the DTA. 175 Wn.2d at 106 ("[N]othing in this opinion should be construed to suggest an agent cannot represent the holder of a note. Washington law, and the deed of trust act itself, approves of the use of agents."). However, the court continued, "'a prerequisite of an agency is *control* of the agent by the principal.'" Bain, 175 Wn.2d at 107 (quoting Moss v. Vadman, 77 Wn.2d 396, 402, 463 P.2d 159 (1969)). "[A]gency requires a specific principal that is accountable for the acts of its agent." Bain, 175 Wn.2d at 107. Accordingly, where an entity fails to identify a lawful principal who controls its actions, it has not established that it is an agent for purposes of the DTA. Bain, 175 Wn.2d at 107.

Here, NovaStar's agreement with JPMorgan Chase and J.P. Morgan Trust—the apparent holders of the note at the time QLS was appointed successor trustee—specified that NovaStar's authority as loan servicer included all powers necessary to "effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing a related Mortgage Loan."

- 13 -

NovaStar is correct that the agreement expressly permitted the company to "exercise this power in its own name." However, contrary to NovaStar's assertion that it acted only as an agent, the agreement specified that NovaStar's relationship to JPMorgan Chase and J.P. Morgan Trust was "intended by the parties to be that of an independent contractor *and not that of a joint venturer, partner or agent.*" (Emphasis added.)

The language of this agreement cannot be reasonably construed to indicate that NovaStar was acting as the agent of the true beneficiary. Instead, the agreement appears to give unlimited power to NovaStar to pursue foreclosure actions. There is no suggestion in the agreement that any entity was "accountable for the acts of [NovaStar]." Bain, 175 Wn.2d at 107. Indeed, an inference arises that NovaStar acted without direction from any lawful principal. Because the evidence does not establish that NovaStar was acting as the agent of JPMorgan Chase and J.P. Morgan Trust—the apparent beneficiaries under Rucker's deed of trust—it may well be that NovaStar had no statutory authority to appoint QLS as successor trustee. If this proves true at trial, then QLS had no authority to conduct a trustee's sale of Rucker's property and the foreclosure proceedings were contrary to the DTA. Walker, No. 65975-8-I, slip op. at 10.

Rucker and April do not seek damages based upon this alleged DTA violation. Instead, they contend only that the foreclosure sale must be vacated. Accordingly, we must determine whether vacation of a sale is an available remedy where a trustee is not properly appointed prior to conducting a trustee's sale.

- 14 -

In two recent cases, our Supreme Court has explained that the vacation of a foreclosure sale is required where a trustee has conducted the sale without statutory authority. In Schroeder v. Excelsior Management Group, LLC, 177 Wn.2d 94, 297 P.3d 677 (2013), a property was sold at a trustee's sale despite evidence that the land was used primarily for agriculture. The court explained that the DTA's express requirement that such land be foreclosed judicially cannot be waived contractually. Schroeder, 177 Wn.2d at 107, 112. Moreover, "[a] trustee in a nonjudicial foreclosure may not exceed the authority vested by that statute." Schroeder, 177 Wn.2d at 112. Accordingly, the court directed that "the trial court must hold a hearing to determine whether the property was primarily agricultural at relevant times; if it was, the nonjudicial foreclosure sale shall be vacated." Schroeder, 177 Wn.2d at 115.

Similarly, in Albice v. Premier Mortgage Services of Washington, Inc.,174 Wn.2d 560, 276 P.3d 1277 (2012), the trustee had continued the trustee's sale for 161 days, thus exceeding the 120-day maximum set forth by RCW 61.24.040(6). The court explained that the trustee's failure to act within the allotted time violated the statute, thus divesting the trustee of statutory authority. Albice, 174 Wn.2d at 568. Without such authority, the court explained, "any action taken is invalid." Albice, 174 Wn.2d at 568. Accordingly, the court remanded to the trial court to "enter an order declaring the sale invalid." Albice, 174 Wn.2d at 575.

Here, Rucker and April contend not only that QLS exceeded its statutory authority, but that QLS was never a proper trustee at all. If the failure of a

- 15 -

properly-appointed trustee to follow statutory procedures can result in the vacation of a sale, this remedy is equally appropriate where an entity conducts a trustee sale in the complete absence of authority. There are genuine issues of material fact regarding whether QLS conducted the sale of Rucker's property without such authority. If it is determined at trial that NovaStar was not acting as the agent of a true beneficiary, then the appointment of QLS was improper, and it follows that QLS had no statutory authority to conduct the trustee's sale. As in Schroeder and Albice, in such circumstances, vacation of the sale is a proper remedy.[13]

The trial court erred by granting summary judgment to NovaStar based upon a determination that the trustee's sale was valid.[14] A trial is required to determine whether QLS was a properly-appointed successor trustee entitled to conduct the sale.

## IV

NovaStar contends that even if the trustee's sale was invalid, Rucker and April waived their right to challenge the sale by failing to bring a presale lawsuit to restrain the nonjudicial foreclosure. We disagree.

"Waiver is an equitable principle that can apply to defeat someone's legal

[13] Rucker and April further assert that the note and deed of trust are void because Rucker had not yet executed a power of attorney at the time that Micaela signed these documents on his behalf. However, even if Micaela signed without proper authority, Rucker clearly ratified Micaela's signing of the note and deed of trust by subsequently making six months of payments on the loans. Indeed, Rucker testified that it was his intent to grant to Micaela the power to act on his behalf with respect to "an agreement of sale, loan application, note, mortgage, [and] deed of trust regarding the purchase and financing of the premises." The trial court did not err by determining that no genuine issue of material fact existed with respect to this issue.

[14] Because material issues of fact exist, the trial court did not err by denying the motion of Rucker and April for summary judgment in their favor.

rights where the facts support an argument that the party relinquished their rights by delaying in asserting or failing to assert an otherwise available adequate remedy." Albice, 174 Wn.2d at 568. Our Supreme Court has explained that in the foreclosure context, a person may waive his or her postsale claims where the person: (1) received notice of the right to enjoin the sale, (2) had actual or constructive knowledge of a defense to foreclosure prior to the sale, and (3) failed to bring an action to obtain a court order enjoining the sale. Plein v. Lackey, 149 Wn.2d 214, 227, 67 P.3d 1061 (2003). However, the court has explained, waiver does not apply to all circumstances or types of postsale challenges.[15] Albice, 174 Wn.2d at 570. Instead, waiver is applicable "only where it is equitable under the circumstances and where it serves the goals of the act."[16] Albice, 174 Wn.2d at 570. "[I]n determining whether waiver applies, the second goal—that the nonjudicial foreclosure process should result in . . . interested parties having an adequate opportunity to prevent wrongful foreclosure—becomes particularly important." Albice, 174 Wn.2d at 571.

In Albice, the owners of a residence entered into a forbearance agreement to cure the default on their loan. 174 Wn.2d at 564. They agreed to tender monthly payments in order to postpone the nonjudicial foreclosure sale. Id. Although each payment was tendered late, the loan servicer nevertheless

---

[15] "Where applicable, waiver only applies to actions to vacate the sale and not to damages actions." Klem v. Wash. Mut. Bank, 176 Wn.2d 771, 796, 295 P.3d 1179 (2013). Here, of course, Rucker and April seek only to vacate the sale.

[16] The DTA is construed to further three basic objectives: "'First, the nonjudicial foreclosure process should remain efficient and inexpensive. Second, the process should provide an adequate opportunity for interested parties to prevent wrongful foreclosure. Third, the process should promote the stability of land titles.'" Schroeder, 177 Wn.2d at 104 (quoting Cox v. Helenius, 103 Wn.2d 383, 387, 693 P.2d 683 (1985)).

accepted the payments. Id. However, when the homeowners tendered their final payment 17 days late, the loan servicer deemed this to constitute a breach of the forbearance agreement. Id. Accordingly, the payment was rejected. Id. Although the forbearance agreement provided that upon breach, a 10-day written notice would be issued, the homeowners never received such a notice. Id. The property was thereafter sold at a trustee's sale only six days after the loan servicer's rejection of the homeowners' final payment. Id.

Under these circumstances, our Supreme Court concluded that "waiver cannot be equitably established." Albice, 174 Wn.2d at 571. The court explained that, during the period that the homeowners were making payments under the forbearance agreement, they had no reason to seek to restrain the sale because they reasonably believed that such a sale would not proceed:

> [The homeowners] had no knowledge of their alleged breach in time to restrain the sale. [The homeowners] tendered all payments, albeit late, under the Forbearance Agreement. [The loan servicer] accepted all of those late payments and permitted [the trustee] to continue the sale each time, except for the last. By repeatedly accepting the prior late payments, [the loan servicer] created expectancy in [the homeowners] that their last late payment would also be accepted. [The homeowners] could not have known [the loan servicer] would consider their last late payment a breach of the agreement, having never done so before. They reasonably believed their last payment cured the default. While the Forbearance Agreement stated they would receive a 10-day written notice upon breach, [the homeowners] never received this notice. They rightly assumed the sale would be canceled after they tendered their last payment.

Albice, 174 Wn.2d at 571-72. Because the loan servicer misled the homeowners into believing that the sale would not take place—thereby depriving them of the opportunity to prevent an unlawful foreclosure—the court held that the

- 18 -

homeowners did not waive their rights by failing to bring a presale lawsuit.[17] Albice, 174 Wn.2d at 572.

Here, there are genuine issues of material fact regarding the reasons for the decision not to file a lawsuit to restrain the sale. In both the trial court and on appeal, Rucker and April assert that they reasonably relied upon the representation of a QLS employee that the sale would not take place. This employee, however, did not testify and, accordingly, April's statements were the only evidence that such a representation was made. No written confirmation of the alleged postponement was presented. Nor is it clear that the failure to pursue a lawsuit to restrain the sale was entirely prompted by the QLS employee's representation. April also testified that she did not pursue a foreclosure sale because she was unaware that as a tenant of the property, she had any right to challenge the sale.[18] For his part, Rucker testified that he had no personal knowledge that a foreclosure sale was even set to take place.

Nevertheless, in reviewing a summary judgment order, the evidence must be viewed in the light most favorable to the nonmoving party. Both Rucker and April assert that they would have filed a lawsuit had they known that the

---

[17] The court further explained that its decision would serve to promote the stability of land titles, the third goal of the DTA. "[T]o ensure trustees strictly comply with the requirements of the act, courts must be able to review postsale challenges where, like here, the claims are promptly asserted." Albice, 174 Wn.2d at 572. Enforcing such statutory compliance, the court noted, "encourages trustees to conduct procedurally sound sales." Albice, 174 Wn.2d at 572. The court explained that when trustees strictly comply with their legal obligations under the act, "interested parties will have no claim for postsale relief, thereby promoting stable land titles overall." Albice, 174 Wn.2d at 572.

[18] Contrary to April's belief, the notice of trustee's sale stated that "[a]nyone having any objections to this sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130."

foreclosure sale would go forward. NovaStar points to no evidence indicating that a QLS employee did not, in fact, represent to April that no sale would take place. Nor does it argue that a homeowner would not be entitled to rely upon such a representation. Instead, the corporation points only to evidence demonstrating that the sale took place as scheduled. Such evidence, however, is not relevant to the question of reliance.

Because there are genuine issues of material fact regarding, first, whether a representation was made and, second, whether Rucker and April reasonably relied upon that representation in failing to bring a lawsuit to restrain the sale, the trial court erred by determining on summary judgment that Rucker and April waived their right to challenge the sale.[19]

Reversed.

We concur:

---

[19] Rucker and April further contend that there are issues of fact regarding whether NovaStar was, in fact, the winning bidder at the trustee's sale. Because we determine that a trial is required, we do not address this remaining contention.