# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56435-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JEFFERY ALAN ROBERTS, | |
| Appellant. | |

MAXA, P.J. – Jeffery Roberts was convicted of multiple offenses.  On appeal, he claims that his convictions of second degree assault, first degree kidnapping, and attempted first degree rape violate double jeopardy.  Roberts also challenges all his convictions in a statement of additional grounds (SAG).  The State cross-appeals the trial court's dismissal of Roberts's unlawful imprisonment conviction.

Roberts and AB were in an intimate relationship.  Roberts was very controlling, and over several months he stalked, harassed, and threatened AB.  The assault, kidnaping, and attempted rape convictions arose from an incident that started when AB returned home late at night and found Roberts parked in her driveway.  Roberts demanded that she come with him to his house and stated that he was not leaving until she did. He said that he was going to ram AB's car and lurched his truck at AB as if he were going to ram her.  AB was afraid of what he might do, so she drove to Roberts's house while he drove inches behind her.  Once they arrived at Roberts's

house and went into his room, Roberts calmed down and attempted to calm down AB. Roberts then began to pull down AB's pants, but the police arrived and arrested him.

The unlawful imprisonment conviction arose out of an incident the previous day, when AB noticed Roberts's truck in her rearview mirror chasing her as she was driving home. AB parked in her driveway, and Roberts jumped out of his truck and opened AB's car door. He blocked AB from exiting the car for several minutes while he yelled at her. AB did not feel like she could get away.

At the sentencing hearing, the trial court concluded that the second degree assault, first degree kidnapping, and attempted first degree rape convictions constituted the same criminal conduct for sentencing purposes but did not violate double jeopardy. The court also, without a motion from Roberts, dismissed the unlawful imprisonment conviction because of insufficient evidence.

Regarding Roberts's appeal, we hold that (1) Roberts's first degree kidnapping and attempted first degree rape convictions do not violate double jeopardy, (2) Roberts's second degree assault and first degree kidnapping convictions violate double jeopardy and therefore the second degree assault conviction must be dismissed, and (3) we decline to consider Roberts's SAG assertions. Regarding the State's cross-appeal, we hold that the trial court erred in dismissing Roberts's unlawful imprisonment conviction because substantial evidence supported that conviction.

Accordingly, we affirm all of Roberts's convictions except for the second degree assault conviction. We remand for the trial court to dismiss Roberts's second degree assault conviction, to reinstate Roberts's unlawful imprisonment conviction, and for resentencing.

FACTS

*Background*

AB and Roberts met approximately nine years before trial when AB was 19 years old and Roberts was 38 or 39. They were friends for six or seven years before the relationship became intimate. At that point, Roberts became very controlling. Throughout 2020, Roberts would call AB 25 to 50 times per day, often leaving voicemails threatening to hurt her or damage her property. He also would follow her and appear uninvited at the house where she lived with her father, sometimes in the middle of the night. AB called 911 three times regarding Roberts's conduct.

In June 2020, Roberts showed up at AB's house at 7:00 AM and banged on the outside wall near AB's bedroom. AB's father went outside to talk with him, and Roberts was angry, yelling, threatening, and demanding to see AB. Roberts shoved AB's father multiple times back into the house and burst into AB's bedroom. Roberts slammed the door and would not let AB's father in as AB screamed for her father to call the police. AB's father called the police, but Roberts left before they arrived.

On August 6, AB was out when she received several calls from Roberts, which she ignored. As she pulled into her housing development in Graham, she passed Roberts's truck coming in the opposite direction. All of a sudden she saw Roberts in her rearview mirror, and he was chasing her. AB drove to her house, parked her car in the driveway, and yelled for her father. Roberts pulled up behind her. Roberts jumped out of his truck and yanked AB's car door open. He blocked AB so she could not get out of the car and screamed at her. AB finally told Roberts that she would speak to him if he stopped yelling. Roberts then let her out of the car and left AB's house after they talked.

The next day, AB was out with a friend when she received threatening calls and texts from Roberts asking where she was. When AB got home at approximately 1:00 AM on August 8, she saw headlights from a vehicle blocking her driveway and assumed it was Roberts. AB called Roberts and told him to get away from her driveway and to leave, but Roberts said that he was not leaving until she came with him.

Roberts got out of his truck and started shouting at AB, saying that he was not going to let her through and demanding that she go to his house. He also stated that he was going to ram her car. Roberts got back in his truck, revved the engine and began lurching his truck toward AB's car, acting like he was going to ram her. Roberts was driving a big, lifted truck. When he lurched the truck forward, AB was afraid that he was going to ram her car.

AB felt like she was forced to go to Roberts's house, and so she started driving there. Roberts drove inches behind AB on the way to his house. AB called her father on the drive there and asked him to call the police because he knew Roberts's address and could give it to them. AB also called 911 and said that she was being forced to go somewhere that she did not want to go. At that point, she was fearful for her life. AB hung up the phone as she pulled into Roberts's driveway.

Roberts's house was isolated from the road by trees and was not well lit. Roberts parked directly behind and within an inch of AB's car, which prevented AB from backing up and leaving. She could not get out and run because there were few houses around. And it was 1:30 AM and was very dark. Roberts opened the door to AB's car and told her to get in his house. She said she did not want to go, but Roberts said that he did not care and told her to get in the house.

4

AB went inside. Roberts's mother lived in the house, and a young boy also was there. AB went to Roberts's room, where he closed the door and stood blocking the door. Roberts then became very calm, and he tried to calm down AB and tried to explain to AB that the situation was okay. AB stated that she wanted to leave, but Roberts refused. Roberts asked for one more time, which AB interpreted as a request for sex. Roberts began to pull AB's pants down and got them halfway down when the police showed up and arrested him.

Roberts was charged with nine offenses, including unlawful imprisonment relating to the August 6 incident, and second degree assault, first degree kidnapping, and attempted first degree rape relating to the August 8 incident. He also was charged with first degree burglary and fourth degree assault regarding the June 2020 incident, felony harassment between July 25 and August 8, 2020, stalking from January through December 2020, and violation of a no contact order in December 2020.

*Trial*

At trial, AB testified regarding the facts recited above, and her father also testified regarding the incidents in which he was present.

Regarding the August 6 incident, AB testified that Roberts blocked her so she could not get out of her car. He was much bigger than her and she could not get past him to get out of her car. AB did not feel like she could try to get away. AB stated that in the past she had tried to get away from Roberts more than once, but he had thrown her down and injured her and she had never been successful in escaping. AB's father also testified that AB would not have been able to get past Roberts.

In addition, a video of the August 6 incident was captured on the house's surveillance system, which was admitted into evidence and played for the jury. The video (which had no

sound) showed that Roberts stood next to AB's open car door for approximately seven minutes in a manner that prevented her from exiting through that door. At times he leaned completely into the car, pushing his face into AB's face as she moved away from him.

The State also played several recorded voicemail messages that Roberts left on AB's phone. The messages contained several threats, including: "I'm gonna f***ing hurt you so f***ing bad"; "I'm gonna break your f***in' neck"; "I'll f*** you up"; "I'm gonna beat your mother f***in' head in"; "[y]ou're a dead ass"; and "[y]ou're dead." Ex. at 13.

The jury convicted Roberts of all nine charged offenses, including unlawful imprisonment, second degree assault, first degree kidnapping, and attempted first degree rape.

*Sentencing*

At the sentencing hearing, the trial court asked whether there was enough evidence to support the unlawful imprisonment conviction even though Roberts had not filed a motion to dismiss that conviction. The parties discussed the circumstances regarding the incident on August 6, 2020 and the video. Ultimately, the court ruled that there was insufficient evidence of unlawful imprisonment to convict as a matter of law and stated that the conviction would be dismissed. The State objected to the dismissal. The court entered an order dismissing the unlawful imprisonment conviction.

The trial court concluded that the second degree assault, first degree kidnapping, and attempted first degree rape constituted the same criminal conduct for purposes of Roberts's offender score. However, the court ruled that the three offenses did not violate double jeopardy. The court sentenced Roberts to 130 months for first degree kidnapping, 140 months to life for attempted first degree rape, and 43 months for second degree assault. All the sentences were

concurrent because first degree kidnapping and attempted first degree rape constituted the same criminal conduct.

Roberts appeals on double jeopardy grounds. The State cross appeals the trial court's dismissal of the unlawful imprisonment conviction.

ANALYSIS

A.    DOUBLE JEOPARDY

Roberts argues that the second degree assault, first degree kidnapping, attempted first degree rape convictions violate double jeopardy. We hold that the first degree kidnapping and the attempted first degree rape convictions do not violate double jeopardy, but the second degree assault and first degree kidnapping convictions do violate double jeopardy.

1.    Legal Principles

The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution state that no person shall be put in jeopardy twice for the same offense. The double jeopardy clauses also protect defendants from being punished more than once for the same offense. *In re Pers. Restraint of Knight*, 196 Wn.2d 330, 336, 473 P.3d 663 (2020). And multiple convictions may implicate double jeopardy even if the corresponding sentences are served concurrently. *State v. Arndt*, 194 Wn.2d 784, 815, 453 P.3d 696 (2019). We review de novo whether separate convictions violate double jeopardy. *Knight*, 196 Wn.2d at 336.

We analyze double jeopardy claims using a four-part analysis. *Arndt*, 194 Wn.2d at 816. First, we consider whether " 'there is clear legislative intent to impose multiple punishments for the same act or conduct.' " *Id.* (quoting *State v. Kelley*, 168 Wn.2d 72, 77, 226 P.3d 773 (2010)). If so, then the inquiry stops and there is no double jeopardy violation. *Arndt*, 194 Wn.2d at 816.

If no clear legislative intent exists, the second step in the analysis is to apply the *Blockburger*[1] "same evidence" test. *Id.* at 818. " '[W]here *the same act or transaction* constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision *requires proof of a fact which the other does not.*' " *Id.* (quoting *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 817, 100 P.3d 291 (2004)). "We consider the elements of the crimes as charged and proved, not merely as the level of an abstract articulation of the elements." *State v. Freeman*, 153 Wn.2d 765, 777, 108 P.3d 753 (2005). The question is whether proof of one offense as charged requires proof of every element of the other offense. *Arndt*, 194 Wn.2d at 818. "[I]f each offense, as charged, includes elements not included in the other, the offenses are different and multiple convictions can stand." *State v. Calle*, 125 Wn.2d 769, 777, 888 P.2d 155 (1995).

The third step in the analysis involves application of the merger doctrine. *Arndt*, 194 Wn.2d at 819. The merger doctrine

> applies where the Legislature has clearly indicated that in order to prove a particular degree of crime . . . the State must prove not only that a defendant committed that crime . . . but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes.

*State v. Berg*, 181 Wn.2d 857, 865, 337 P.3d 310 (2014) (quoting *State v. Vladovic*, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983)). " 'Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime.' " *Arndt*, 194 Wn.2d at 818 (quoting *Freeman*, 153 Wn.2d at 772-73). Again, we must consider the offenses as charged and proved. *See Freeman*, 153 Wn.2d at 778.

---

[1] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

The fourth step involves an exception to the merger doctrine. *Arndt*, 194 Wn.2d at 819. Separate punishments are allowed "when overlapping offenses have independent purposes or effects." *Id.* " 'To establish an independent purpose or effect of a particular crime, that crime must injure the person or property of the victim or others in a separate and distinct manner from the crime for which it also serves as an element.' " *Id.* (quoting *State v. Harris*, 167 Wn. App. 340, 355, 272 P.3d 299 (2012)). The separate injury must be more than merely incidental to the crime of which it forms an element. *Berg*, 181 Wn.2d at 866. This exception can apply even if two convictions appear to be the same offense or appear to merge. *Knight*, 196 Wn.2d at 337. The focus is on the specific facts of each case. *Id.* at 338.

The remedy for double jeopardy violations is to vacate the lesser offense or the charge that carries a lesser sentence. *State v. Albarran*, 187 Wn.2d 15, 21-22, 383 P.3d 1037 (2016).

2. Applicable Statutory Provisions

Under RCW 9A.36.021(1)(c), a person is guilty of second degree assault if the person "[a]ssaults another with a deadly weapon" under circumstances not amounting to first degree assault. A deadly weapon means any weapon, including a vehicle, that "under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6).

Under RCW 9A.40.020(1), a person if guilty of first degree kidnapping if the person "intentionally abducts another person with intent . . . (b) To facilitate commission of any felony." The term "abduct" means "to restrain a person by either (a) secreting or holding him or her in a place where he or she is not likely to be found, or (b) using or threatening to use deadly force." RCW 9A.40.010(1).

Under RCW 9A.44.040(1), a person is guilty of first degree rape "when such person engages in sexual intercourse with another person by forcible compulsion where the perpetrator . . . (b) Kidnaps the victim." A person is guilty of an attempt to commit a crime if, with the "intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1).

The trial court properly instructed the jury with regard to the statutory requirements of these offenses.

3.    Analysis – First Degree Kidnapping and Attempted First Degree Rape

Roberts argues that his convictions of first degree kidnapping and attempted first degree rape violate double jeopardy. We disagree.

Roberts argues, and the State concedes, that we must presume under the merger doctrine that the legislature intended to punish first degree kidnapping and attempted first degree rape only once because kidnapping is the predicate for first degree attempted rape as charged and proved in this case. The dispositive question here involves step four of the double jeopardy analysis – whether the independent purpose or effects exception to the merger doctrine applies. *See Arndt*, 194 Wn.2d at 819. As noted above, this exception applies if the kidnapping injured AB in a separate and distinct manner from the attempted rape. *See id.*

We conclude that the kidnapping had an independent purpose and caused a separate injury than the attempted rape. Viewing the evidence as a whole, the kidnapping was a continuation of Roberts's previous attempts to control, dominate, intimidate, and harass AB. He sought to impose his will and force AB to go somewhere she did not want to go to demonstrate to AB that he could control her. As a result, the evidence shows that Roberts did not kidnap AB solely to attempt to rape her. His goal was to force her to come to his house because that is what

10

he wanted and to show that he could control AB. Once AB was there, he calmed down. The attempted rape seemed almost like an afterthought.

In addition, the two crimes caused separate injuries. The injury from the kidnapping was the fear and emotional distress that was a continuation of Roberts's previous harassing and threatening behavior. That injury was complete once Roberts got AB in his house and calmed down. And that injury was completely different that the injury caused by the attempted rape – AB's fear that she would be sexually assaulted.

We hold that Roberts's first degree kidnapping and attempted first degree rape convictions do not violate double jeopardy.

4. Analysis – Second Degree Assault and First Degree Kidnapping

Roberts argues that his second degree assault and first degree kidnapping convictions violate double jeopardy. We agree.

a. Offenses as Charged and Proved

The trial court instructed the jury that a person commits second degree assault if the person assaults another with a deadly weapon. *See* RCW 9A.36.021(1)(c). The trial court instructed the jury that a person commits first degree kidnapping if the person abducts another with the intent to facilitate the commission of attempted first degree rape, and defined "abduct" as "either secreting or holding the person in a place where that person is not likely to be found or using or threatening to use deadly force." Clerk's Papers at 125.

b. Applicable Cases

In *State v. Taylor*, the defendant challenged on double jeopardy grounds his convictions of second degree assault and second degree kidnapping. 90 Wn. App. 312, 314-15, 950 P.2d 526 (1998). The convictions arose out of an incident in which the defendant and an accomplice

11

jumped into a vehicle, put a gun to the driver's head, and forced him to drive to a particular location. *Id.* at 315. The second degree assault conviction was based on an assault with a deadly weapon, and the second degree kidnapping was based on abduction by threatening to use deadly force. *Id.* at 318.

This court held that the two convictions did not violate double jeopardy because the "legal elements of these two crimes are not identical." *Id.* at 319. The court stated:

> Assault with a deadly weapon does not contain the same legal elements as kidnapping by the use or threatened use of deadly force. One can kidnap a victim using deadly force by directing the force against the victim's guardian or caretaker. Thus, to commit second degree kidnapping, unlike second degree assault, it is not necessary to place the victim in fear or apprehension of harm. Conversely, one can commit an assault without abducting the victim.
>
> Moreover, one can threaten or use deadly force during a kidnapping without using a deadly weapon.

*Id.* at 318-19. The court concluded that "the threat or use of deadly force is not synonymous with the commission of second degree assault with a deadly weapon." *Id.* at 319.

The court also determined that the legislature did not intend second degree assault to merge with second degree kidnapping. *Id*. at 320. First, "[t]hese offenses arise in different chapters of the penal code." *Id.* Second, the purposes of the two offenses are not the same: "The second degree assault with a firearm statute criminalizes conduct that inflicts or attempts to inflict or places a person in fear of physical harm." *Id.* "The second degree kidnapping statute, on the other hand, criminalizes the abduction of victims against their will through the use of deadly force." *Id.* Third, the applicable statutes do not contain language indicating that the legislature clearly intended one crime to be an element of the other. *Id.*

In *State v. Davis*, the defendant challenged on double jeopardy grounds his convictions of two counts of second degree assault and two counts of second degree kidnapping. 177 Wn. App.

454, 456, 311 P.3d 1278 (2013). The convictions arose out of an incident in which the defendant and two codefendants, while acting as repossession agents, forced two people out of a car at gunpoint and moved them to a second car. *Id.* at 456-57.

Division One of this court held that the second degree assault convictions merged into the second degree kidnapping convictions. *Id.* at 465. The court first noted that depending on the facts, conduct constituting second degree assault can elevate unlawful imprisonment to kidnapping:

> One means of abducting a person, i.e., committing the crime of second degree kidnapping, is to restrain the person by "using or threatening to use deadly force." RCW 9A.40.010(1). But when the restraint is accomplished without the use of such force, the result is the lesser offense of unlawful imprisonment. Assault in the second degree is committed, among other ways, by assault with a deadly weapon. RCW 9A.36.021(1)(c). Thus, in certain cases an assault with a deadly weapon can constitute the use or threatened use of deadly force that raises unlawful imprisonment to kidnapping in the second degree.

*Id.* at 462.

The court stated that *Taylor* was "inapposite" for two reasons. *Id.* at 463. First, the court in *Taylor* did not address "whether the State had to prove the act that constituted the assault in order to elevate a lesser crime to kidnapping in the second degree." *Id.* Second, the court noted that unlike in *Taylor*,

> courts discussing merger have focused on the manner in which the offenses were charged and proved in a particular case and asked whether the State was required to prove the act constituting the merging crime to elevate the other crime. That is, courts have not simply looked at the crimes in the abstract, as the court did in *Taylor*.

*Id.*

The court discussed *Freeman* and two other cases, in which the courts focused on how the offenses were charged and proved in determining whether the offenses merged. *Id.* at 463-64. The court then stated, "In light of these cases, to the extent *Taylor* can be read for the

13

holding that kidnapping in the second degree and assault in the second degree may never merge, we disagree. As in *Freeman*, we will look at how the offenses here were charged and proved."

*Id.* at 464.

Turning to the specific facts of the case, the court stated,

Here, the act constituting assault in the second degree (i.e., assault with a deadly weapon) was Davis's act in pointing the gun at the victims. That same act constituted the threatened use of deadly force that was the means by which the State charged and proved that Davis committed kidnapping in the second degree: by restraining [the victims] through the threatened use of deadly force. Without the conduct amounting to assault in the second degree, Davis would have been guilty only of the lesser offense of unlawful imprisonment. . . . Stated differently, under these facts, *the State was required to prove that Davis engaged in the conduct amounting to second degree assault to elevate unlawful imprisonment to second degree kidnapping*. Thus the assault as to each victim merged with the kidnapping as to that victim.

*Id.* at 464-65 (emphasis added).

c.    Same Evidence/Merger Analysis

The parties agree that the second degree assault and first degree kidnapping statutes do not expressly authorize separate punishments for the same conduct. Therefore, we focus on the second and third steps of the double jeopardy analysis. *See Arndt*, 194 Wn.2d at 818-19.

The assault with a deadly weapon as charged and proved here included Roberts threatening to ram AB's car with his truck. One of the ways to prove abduction – required to establish kidnapping – is threatening to use deadly force. RCW 9A.40.010(1)(b). Roberts threatened to use deadly force by threatening to ram AB's car with his truck. Therefore, the State necessarily proved second degree assault by proving first degree kidnapping by a threat to use deadly force. Stated in terms of the same evidence test, the evidence that proved first degree kidnapping by a threat to use deadly force was the same evidence that proved second degree assault.

14

In addition, the second degree assault and the first degree kidnapping convictions must merge because the assault with a deadly weapon elevated the second offense from unlawful imprisonment to kidnapping. As noted above, the State proved both second degree assault and first degree kidnapping by showing that Roberts threatened to ram AB's car with his truck. Without the second degree assault, there arguably would have been no abduction as defined in RCW 9A.40.010(1) and the State could have proved only unlawful imprisonment.

The facts here are virtually identical to the facts in *Davis*. As in *Davis*, the same act that constituted second degree assault allowed the State to prove kidnapping rather than unlawful imprisonment. The State urges us to follow *Taylor* and disregard *Davis* and hold that second degree assault does not merge with first degree kidnapping here. But we agree with the court in *Davis* and conclude that *Davis* directly controls here. We decline to follow *Taylor* to the extent that it suggests that second degree assault can never merge with first degree kidnapping. Rather than looking in the abstract at the elements that comprise the two offenses, we must look at how the offenses were charged and proved in this case.

The State argues that the same evidence did not establish both second degree assault and first degree kidnapping and proving second degree assault was not necessary to elevate the offense from unlawful imprisonment to kidnapping here for two reasons. First, the State claims that Roberts already had communicated threats of deadly force in his voicemail messages to AB the previous week, and those threats were sufficient to prove abduction by the threat of deadly force even without Roberts's threat to ram AB's car. But the evidence does not support this argument. In order to abduct a person, the defendant must "restrain" that person by threatening deadly force. There was no evidence that Roberts "restrained" AB by making voicemail threats in prior days.

Second, the State claims that Roberts also secreted AB in a place where it was unlikely that she would be found by taking her to his secluded house, another way of proving abduction besides threatening deadly force. The State argues that this conduct was sufficient to prove abduction even without Roberts's threat to ram AB's car.

Again, the evidence does not support this argument. Even though Roberts's house was in a secluded area, the house had a known address and was occupied by his mother and a child. AB's father knew Roberts's address and AB knew where to go although she did not have the exact address. There was no evidence that AB was unlikely to be found in that house.

In addition, the jury verdict did not specify the acts on which the jury relied to convict Roberts of first degree kidnapping. As the State argues, the jury could have relied on Roberts's voicemail threats to establish abduction by the threat of deadly force. But the jury also could have relied on Roberts's threat to ram AB's car. Therefore, the verdict was ambiguous in this respect. And as the State argues, the jury could have relied on Roberts taking AB to a place where it was unlikely she would be found to establish abduction. But the jury also could have relied on Roberts's threat of deadly harm – ramming AB's car. Therefore, the verdict was ambiguous in this respect.

When the verdict is ambiguous, there is no way to determine whether the jury used the same evidence to convict the defendant of two crimes or used one crime to elevate another lesser crime to a greater crime and the rule of lenity must be applied to merge the two convictions. *State v. Kier*, 164 Wn.2d 798, 812-13, 194 P.3d 212 (2008); *State v. Whitaker*, 192 Wn. App. 395, 411-17, 367 P.3d 1092 (2016); *State v. DeRyke*, 110 Wn. App. 815, 822-24, 41 P.3d 1225 (2002), *aff'd on other grounds*, 149 Wn.2d 906, 73 P.3d 1000 (2003). The court stated in *Whitaker*,

16

> While it is true there were multiple violations of the court order protecting Spalding throughout the charging period, we cannot be certain which served as the basis for the jury to convict Whittaker of felony stalking. *The possibility that the jury could have convicted Whittaker on a basis that does not offend the double jeopardy protections to which he is entitled is simply not enough to cure the problem.* The verdict is ambiguous. The rule of lenity applies.

192 Wn. App. at 417 (emphasis added).[2]

We conclude that the same evidence and merger steps of the double jeopardy analysis establish that Roberts's second degree assault and first degree kidnapping convictions violate double jeopardy.

> d.    Independent Purpose/Effects Exception

Even though application of the same evidence test and the merger doctrine suggests that second degree assault and first degree kidnapping convictions violate double jeopardy, we again must consider the exception to the merger doctrine: whether the second degree assault and first degree kidnapping had independent purposes or effects, or caused separate and distinct injuries. *Arndt*, 194 Wn.2d at 819.

The State argues that the exception applies because the second degree assault and the first degree kidnapping produced separate injuries. The assault put AB in fear of physical harm, while the kidnapping resulted in her involuntary movement. However, these harms were intertwined, not independent. Roberts placed AB in fear of physical harm *for the purpose of* forcing her to involuntarily go to his house. Therefore, we reject the State's argument.

---

[2] The State relies on *In re Personal Restraint of Borrero*, 161 Wn.2d 532, 167 P.3d 1106 (2007) and *State v. Esparza*, 135 Wn. App. 54, 143 P.3d 612 (2006) for the proposition that double jeopardy does not apply if the verdict is ambiguous and the jury could have relied on different evidence to convict of two crimes. However, *Borrero* and *Esparza* involved multiple acts that could be the substantial step for an attempted murder conviction, while *Kier*, *Whitaker*, and *DeRyke* involved evidence supporting completed crimes.

e.  Summary

The jury could have relied on the same evidence to convict Roberts of second degree assault and to establish the abduction element of first degree kidnapping – Roberts's threat to ram AB's car with his truck.  The jury could have used AB's threat to ram AB with his truck to establish the abduction element and thereby elevate what would be unlawful imprisonment to kidnapping.  Therefore, the two convictions violate double jeopardy under both the same evidence test and the merger doctrine.

We hold that Roberts's second degree assault and first degree kidnapping convictions violate double jeopardy, and therefore the second degree assault conviction must be dismissed.

B.    SUFFICIENCY OF EVIDENCE – UNLAWFUL IMPRISONMENT

The State argues that the trial court erred in dismissing Roberts's unlawful imprisonment conviction based on insufficient evidence.  We agree.[3]

The test for determining sufficiency of evidence is whether any rational trier of fact could find all the elements of the charged crime beyond a reasonable doubt after viewing the evidence in a light most favorable to the State.  *State v. Bergstrom*, 199 Wn.2d 23, 40-41, 502 P.3d 83 (2022).  In a sufficiency of the evidence claim, the defendant admits the truth of the State's evidence and all reasonable inferences drawn from that evidence.  *Id.* at 41.  Circumstantial and direct evidence are equally reliable.  *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017).  We defer to the trier of fact regarding evaluation of the evidence and credibility determinations.  *Bergstrom*, 199 Wn.2d at 41.

---

[3] Initially, the State argues that the trial court did not have the authority to sua sponte dismiss one of Roberts's convictions.  But regardless of the trial court's authority, we will address whether sufficient evidence supports the unlawful imprisonment conviction.

"A person is guilty of unlawful imprisonment if he or she knowingly restrains another person." RCW 9A.40.040(1). Restrain means to "restrict a person's movement without consent and without legal authority in a manner which interferes substantially with his or her liberty." RCW 9A.40.010(6). "Interferes substantially" means an interference that is more than " 'a petty annoyance, a slight inconvenience, or an imaginary conflict.' " *State v. Dillon*, 12 Wn. App. 2d 133, 144, 456 P.3d 1199 (2020) (quoting *State v. Washington*, 135 Wn. App. 42, 50, 143 P.3d 606 (2006)). The presence of a means of escape is a defense to unlawful imprisonment unless 'the known means of escape . . . present[s] a danger or more than a mere inconvenience.' " *Dillon*, 12 Wn. App. 2d at 144 (quoting *State v. Kinchen*, 92 Wn. App. 442, 452 n.16, 963 P.2d 928 (1998)).

Here, the testimony of AB, her father, and the video of the incident provided sufficient evidence that Roberts substantially interfered with AB's liberty on August 6, 2020. AB testified that Roberts blocked her from leaving her car as he yelled at her. She said that he was much bigger than her, so she could not get past him. AB's father testified that AB would not have been able to get past Roberts. And the video shows that Roberts stood next to AB's car door for approximately seven minutes while AB remained in the car. This conduct involved more than a slight inconvenience.

Roberts argues that AB did not testify that she was unable to exit the car through the passenger door, which he was not blocking. However, AB testified that Roberts had physically hurt her when she had tried to escape from him in the past. The jury could infer from this testimony that her means of escape presented a danger.

We conclude that viewing the evidence in a light most favorable to the State, there was sufficient evidence to support Roberts's conviction for unlawful imprisonment.

19

C.    SAG CLAIMS

Roberts asserts several claims in his SAG.  We decline to consider these claims.

1.    Ineffective Assistance of Counsel

Roberts asserts that he never had a pretrial conference with his defense counsel, did not see his discovery until trial, and informed his counsel to call all witnesses except his mother.  He also asserts that his counsel never entered evidence of phone records and text messages showing that AB wanted to have sex with him as soon as he got out of jail.  However, because these claims rely on matters outside the record, we cannot consider them in this direct appeal.  *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).  Instead, they must be raised in a personal restraint petition.  *Id.*

2.    Missing Evidence

Roberts asserts that he had a lot more evidence that could have been used in his favor at discovery and if he had a pretrial conference.  However, although Roberts does not identify the evidence that he claims should have been used, that evidence apparently is outside our record.  Therefore, we cannot consider this claim.  *Alvarado*, 164 Wn.2d at 569.

3.    Text Messages from AB

Roberts asserts that the record will show that he was being texted by AB while in court on April 22, 2021.  Because this claim relies on matters outside our record, we cannot consider it.  *Alvarado*, 164 Wn.2d at 569.

4.    Edited Video and Hearsay Evidence

Roberts asserts that the video shown at trial was edited by AB's father and that the testimony was all hearsay.  Because the editing claim relies on matters outside our record, we cannot consider it.  *Alvarado*, 164 Wn.2d at 569.  And Roberts does not identify the evidence he

claims constituted hearsay or show that he objected to any testimony on that basis. Therefore, we will not consider this claim. RAP 10.10(c).

## CONCLUSION

We affirm all of Roberts's convictions except for the second degree assault conviction. We remand for the trial court to dismiss Roberts's second degree assault conviction, to reinstate Roberts's unlawful imprisonment conviction, and for resentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, P.J.


We concur:

_____
VELJACIC, J.

_____
PRICE, J.